IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**CECILIO MARTINEZ, SR., ex rel.**
**CECIL J. MARTINEZ, JR.**
**(deceased),**

       **Plaintiff,**

vs.                                                                                                      Civ.  No. 02-0349 BB/RLP

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

       **Defendant.**

**UNITED STATES MAGISTRATE JUDGE'S**
**ANALYSIS AND RECOMMENDED DISPOSITION[1]**

1.       This Court exercises jurisdiction pursuant to 42 U.S.C.§405(g), in order to review the final decision of the Commissioner of Social Security regarding the claim for Disability Insurance Benefits filed by Cecil J. Martinez, Jr. ("Plaintiff" herein).[2]  After Plaintiff's application was denied initially and on reconsideration, he requested and received a *de novo* hearing before an administrative law judge ("ALJ" herein).  He appeared at that hearing with a non-lawyer representative.

2.       The ALJ issued his written decision on July 22, 1999.  He concluded at step two of the sequential evaluation process that Plaintiff had severe impairments of polycystic kidney disease[3],

---

[1] Within ten (10) days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to 28 U.S.C. §636(b)(1), file written objections to such proposed findings and recommendations.  A party must file any objections within the ten (10) day period if that party seeks appellate review of the proposed findings and recommendations.  If no objections are filed, no appellate review will be allowed.

[2] Plaintiff died on May 9, 2002.  Mr. Martinez, Sr. was substituted as Plaintiff by order dated July 12. 2002.  Plaintiff originally sought both disability insurance benefits and supplemental security income.  Because he left no surviving spouse his claim for SSI has lapsed.  20 C.F.R. §416.542(2002).

[3] Polycystic kidney disease is an hereditary disorder in which cysts form in both kidneys.  The cysts gradually enlarge, destroying some or most of the normal tissue in the kidneys.  See Robert Berkow, Mark

hepatitis C, diabetes mellitus and hypertension. Despite Plaintiff's limitations the ALJ concluded that he retained the residual functional capacity ("RFC" herein) for the full range of light work. While this RFC precluded Plaintiff from returning to his past relevant work as an assembler and janitor, the ALJ concluded that Plaintiff could perform other work in the national economy pursuant to the medical vocational guidelines. Therefore, the ALJ denied Plaintiff's application for benefits at step five of the sequential evaluation process.

3.     Plaintiff secured the services of an attorney and petitioned for review before the Appeals Council. No additional medical records were provided to the Appeals Council. The Appeals Council declined Plaintiff's petition for review, and the ALJ's decision became the final decision of the Commissioner. Plaintiff now moves this Court for an Order reversing the Commissioner's decision with instructions to remand for additional proceedings (Docket No. 8).

## Issues presented

4.     Plaintiff raises five challenges to the Commissioner's decision. First, Plaintiff maintains that the ALJ erred in relying on an inadequately supported opinion of a non-examining agency physician in ascertaining his RFC. Second, he contends that the ALJ failed to perform the analysis required at step three of the sequential evaluation process. Third, he argues that the ALJ failed to make a proper credibility assessment. Fourth, he contends that he ALJ failed to consider his non-exertional impairments. Fifth, he contends that he was biased by incompetent representation in proceedings before the ALJ.

## Standard of Review

5.     This Court's role in reviewing the Commissioner's decision is to determine whether the

---

Beers, and Andrew J. Fletcher, The Merck Manual of Medical Information 618 (Home Ed.1997).

decision is supported by substantial evidence and whether correct legal standards were applied.[4] Substantial evidence is " ' such relevant evidence as a reasonable mind might deem adequate to support a conclusion.' "[5] The court cannot reweigh the evidence or substitute its discretion for that of the Commissioner.[6] A finding of "no substantial evidence" will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence.[7]

Medical and Vocational Facts

6.      Plaintiff was born on April 4, 1967, and completed the 12th grade. (Tr. 62, 77). He alleged disability commencing on April 1, 1995. (Tr. 42, 62, 73, 146-8). He was evaluated at the University of New Mexico Hospital ("UNMH" herein) on November 18, 1996, stating that he had run out of medication a year and a half earlier, and wanted his prescriptions refilled. (Tr. 123-124). Plaintiff had numerous chronic medical problems: Diabetes mellitus, hypertension, alcohol abuse, polycystic kidney disease and hepatitis C. Findings on physical examination were relatively benign except for hepatomegaly. (Tr. 123). He was placed on various medications, advised to check his blood sugar and blood pressure, and to reduce his alcohol use. (Tr. 123-124, 138). When next seen on December 2, 1996, he had no complaints, and no physical examination was performed. (Tr. 122).

7.      Plaintiff did not return to UNMH until June 20, 1997, a year and a half later. (Tr. 121). His chronic medical problems were again listed. The history taken indicated that he continued to drink, only occasionally checked his blood sugar levels, and had been "non-compliant" with his

---

[4] Castellano v. Sec'y of Health & Human Serv's., 26 F.3d 1027, 1028 (10th Cir. 1994).

[5] Soliz v. Chater, 82 F.3d 373, 375 (10th Cir. 1996), quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed.2d 842 (1971).

[6] Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir.1992)

[7] Trimiar, 966 F.2d 1326, 1329 (10th Cir. 1992).

appointments. The treatment note initially indicates the physical examination was deferred, then states that "PE neg per HO" ( physical examination negative per house officer). Total bilirubin was measured as 0.8. (Tr. 136). Plaintiff was scheduled for a renal ultrasound to evaluate his kidneys. He returned to UNMH on July 18, 1997, again with multiple medical conditions but "no complaints." (Tr. 120). His physical examination was benign. He had continued to drink, and was advised to abstain from alcohol in light of the diagnosis of hepatitis C. He was rescheduled for renal ultrasound, eye exam and lab work. Plaintiff failed to appear at his next appointment (Tr. 118-119) and was not seen until September 26, 1997, when his physical examination was again "neg. per HO." (Tr. 117). He was advised to decrease alcohol use. Eye exam and renal ultrasound were rescheduled. The ultrasound obtained on October 21, 1997, confirmed multiple cysts in both kidneys, without obstruction uropathy. (Tr. 125, 108).

8. Plaintiff returned to UNMH on November 7, 1997. (Tr. 116). He was again noted as being noncompliant with regard to taking his medications, keeping appointments and checking his blood pressure and blood sugar levels. No physical examination was performed.

9. When next seen on December 19, 1997, Plaintiff had "for the first time" taken his blood sugar and blood pressure readings at home. Physical examination was deferred. The attending physician noted, "Pt. discussed with resident. Multiple medical problems: Poorly controlled historically secondary to non-compliance. Pt with DM (diabetes mellitus), HTN (hypertension) & Polycystic kidney at high risk for renal failure. Will continue to address compliance issues." (Tr. 115). Lab studies performed five days later indicated a total bilirubin of 0.8 and a creatinine of 1.3. (Tr. 126).

10. Plaintiff was evaluated by an ophthalmologist on January 13, 1998, at the request of the Disability Determination Unit. (Tr. 96-97, 143). Following a complete eye exam, the

4

ophthalmologist diagnosed diabetic retinopathy and hypertension retinopathy, and prescribed eye glasses which corrected Plaintiff's vision to 20/20 in each eye.

11.  Plaintiff's claim for benefits was denied on January 20, 1998. Dr. Recalde, a non-examining physician reviewing the medical record for the Disability Determination Unit, assigned a residual functional capacity for light work[8], with the following narrative explanation:

> 30 y o M (male) (elevated) BP (blood pressure) , DM (diabetes mellitus), Polycystic kidney disease, hep. C (hepatitis C) , ETOH (alcohol) & drugs, allergies, blurred vision.
> UNM --> 11/97 non-compliant with F/U (follow up)  & medications.
>    Renal US : polycystic kidneys, bilat.
>    LFTs (liver function tests): GGT 1464
>             Alk P  174
>             DB      0.4
>             SGOT   163
>   2/4/98 - Creatinine 1.3
>     Reports no kidney related symptoms-
>     Neuro wnl (within normal limits), vision - no change
>     Musculoskeletal - no complaints
>     MER notes continuing noncompliance
>     w/ HTN (hypertension) and DM (diabetes mellitus)not in control.
>          ***
> 1/98 opth. CE (consulting exam)
>   VA (visual acuity) w/g (with glasses)  00 20/20
>   DM/HTN retinopathy.

(Tr. 98-105).

12.  One week following his initial administrative denial Plaintiff was evaluated at the UNMH nephrology department. (Tr. 108-113). The attending physician, Dr. Spaulding, noted that Plaintiff suffered from poorly controlled diabetes, polycystic kidney disease with normal creatinine levels, poorly controlled hypertension, a history of renal stone disease, positive hepatitis C without active

---

[8]Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds, requires a good deal of walking, standing, or pushing and pulling when sitting is involved. 20 C.F.R.§§ 404.1567(b) & 416.967(b)

glomerulonephritis, and proteinuria. Despite these chronic problems, Plaintiff was "essentially asymptomatic" (Tr. 108):

> He states that he has known kidney disease, but he is today denying any hematuria, dysuria, hesitation, incontinence, flank pain, nausea or vomiting, or increasing dependent edema. . . . The patient is currently denying any central nervous system problems. He has had no problems with his cardiovascular system, or respiratory. He is denying any GI symptoms. He has no joint pains, no musculoskeletal problems and denies any spontaneous rash. . . . this is a well developed, well nourished male in no acute distress, who appears to be alert and oriented and cooperative. Vital signs - showed a blood pressure of 140/96, a pulse of 84, and a weight of 192. HEENT examination - was normocephalic, without evidence of trauma. Fundoscopic examination reveals no fresh hemorrhages. Neck examination was supple without masses or bruits. Lungs - were clear to auscultation and percussion. Cardiac examination - was regular rate and rhythm of 84, without murmurs, rubs or gallops appreciated. Abdomen - showed bilateral upper quadrant masses, probably polycystic kidneys. No bruits were noted. There was no tenderness to palpation. Extremities - showed a trace of edema, no clubbing or cyanosis was appreciated. Neurological examination - was non-focal and grossly intact.

(Tr. 108-110).

13. Plaintiff requested reconsideration of his disability claims on February 16, 1998, stating that he suffered from diabetes, blurred vision with glaucoma[9], kidney disease, dizziness with headaches, inability to stand, sit, climb, push or pull for long periods or to lift heavy objects. (Tr. 49). Four days later he was evaluated at UNMH. (Tr. 107). No physical examination was recorded. He was noted to have been more compliant with his medication regimen, was scheduled for diabetic education and an eye examination, and asked to return in two months for a follow up examination.

---

[9]Glaucoma is a disorder in which elevated fluid pressure in the eyeball damages the optic nerve and causes loss of vision. Normal intra-ocular pressure measures between 11 and 21 millimeters of mercury (mm Hg.). The Merck Manual of Diagnosis and Therapy, 100-1 (Beers and Berkow eds., 17th ed.1999). The only measurement of Plaintiff's intra-ocular pressures indicates that he did not have glaucoma. (Tr. 96-97). Further, although Plaintiff claimed to be taking eye drops for treatment of glaucoma (Tr. 84), he did not list any such medication (Tr. 90, 93) nor was any prescribed or recommended at the only ophthalmology exam of record. (Tr. 96-97).

14. Approximately one month later Plaintiff's claims for disability were again denied, based upon a review of the medical records through February 20, 1998.  (Tr. 43, 51, 105, 140).

15. Plaintiff appeared at a hearing before an Administrative Law Judge on May 26, 1999.  (Tr. 32-41).  In written materials he indicated that he had received medical care at UNMH after February 20, 1998. (Tr. 89, 91).  His representative stated at the hearing that if the ALJ found Plaintiff to be credible, it would not be necessary to obtain records from a doctor visit several days before. (Tr. 41). Plaintiff testified that he had quit working in April 1995 because of his medical condition, which limited his ability to stand (45 min.),  walk (3-4 blocks) and sit due to fatigue and back, leg and hip pain.  He complained of eye problems (burning), dizziness and limited ability to lift because of locking of his fingers (5 lb.) and a hernia.  He also stated that he had been told he would be on dialysis at a future date.

### Analysis

### Preliminary issue

Criteria for Remand for Additional Proceedings to Consider Materials
Submitted after the Appeals Council Declined Review of Plaintiff's Claim Has Not Been Met.

16. Plaintiff has submitted to this court three sets of  medical records which were not provided to either the ALJ or to the Appeals Council.  The court will construe Plaintiff's submission of these records as a Motion to Remand pursuant to Sentence 6 of  42 U.S.C. §405(g).  The court's authority to order a Sentence 6 remand is delineated by statute, and requires a showing that new and material evidence has come to light which might have changed the outcome of the prior proceeding, and there is good cause for failing to incorporate such evidence in the earlier hearing. [10]  Evidence is new only

---

[10] 42 U.S.C. §405(g); Melkonyon v. Sullivan, 501 U.S. 89, 98-100, 111 S.Ct. 2157, 2163-2164, 115 L.Ed. 2d 79 (1991).  The Supreme Court in Melkonyon at 501 U.S. at 100-101,  noted that Congress, in imposing the requirement that the party seeking new evidence show why it was not gathered and presented

if it was "not in existence or available to the claimant at the time of the administrative proceeding."[11] Evidence is "material" only if "the [Commissioner's] decision might reasonably have been diffrent had the [new] evidence been before [her] when [her] decision was rendered."[12]  A claimant shows "good cause" by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ.[13]  The burden of showing that a remand is appropriate is on the claimant. Oliver v. Sec'y of Health & Human Servs., 804 F.2d 964, 966 (6th Cir.1986)  This showing has not been met. Exhibit A documents medical care predating Plaintiff's alleged date of onset of disability, and was existing and available to Plaintiff as of the date of his administrative hearing and while this matter was pending before the Appeals Council.  It is therefore not "new." Exhibit B documents medical care received prior to the Plaintiff's administrative hearing, and was available to Plaintiff as of the date of his administrative hearing and while this matter was pending before the Appeals Council.  It is therefore not "new."  Exhibit C documents medical care received from January 31, 2000,  six months following the ALJ's decision, until Plaintiff's death on Mary 10, 2002.  These records are not "material" because they do not relate to the time period for which benefits were denied.[14]

---

before, sought "to speed up the judicial process so that these cases would not just go on and on and on." (quoting Congressman Pickle, 125 Cong.Rec. 23383 (1979)).  By encouraging the parties to prepare their cases adequately at the administrative level in the first place will reduce erroneous decisions and time consuming appeals and remands.  Claimants who make such errors can reapply for benefits starting from the date of the new application, as Plaintiff did in this case. (Tr. 10).

[11] Sullivan v. Finkelstein, 496 U.S. 617, 626, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990).

[12] Cagle v. Califano, 638 F.2d 219, 221 (10th Cir. 1981).

[13] Willis v. Sec'y of Health & Human Servs., 727 F.2d 551, 554 (6th Cir. 1984) (per curiam).

[14] Hargis v. Sullivan, 945 F.2d 1482, 1493 (10th Cir. 1991), see also Heimerman v. Chater, 939 F.Supp 832, 833-834 (D. Kan. 1996), citing Szubak v. Secretary of Health & Human Services, 745 F.2d 831,

17.     Plaintiff was represented by a non-attorney from the filing of his claim through the ALJ's decision, and by his present attorney as of August 2, 1999, eleven days following the ALJ's decision. (Tr. 10-12, 158-164). On November 14, 2001, the Appeals Council gave Plaintiff 40 days to submit additional evidence. (Tr. 9). Plaintiff's attorney representative advised the Appeals Council on December 6, 2001, that the non-attorney representative "failed to submit all evidence relevant to the time period in question" but did not provide any additional medical evidence. (Tr. 159).  No good cause has been shown, or even suggested, for Plaintiff's failure to submit additional materials to the Appeals Council in a timely fashion.

The ALJ Did Not Err in Evaluating
Plaintiff's Claim at Step Three of the Sequential Evaluation Process.

18.     "At step three, the ALJ determines whether the claimant's impairment is equivalent to one of a number of listed impairments that the [Commissioner] acknowledges as so severe as to preclude substantial gainful activity."[15]  At this step, the ALJ "compare(s) the symptoms, signs and laboratory findings about (a claimant's) impairment(s) as shown in the medical evidence (associated with the claim), with the medical criteria shown with the listed impairment."[16]  "In reviewing the Listings the ALJ must provide sufficient discussion of his or her conclusion at step three so that the decision can be meaningfully reviewed."[17]

19.     The ALJ specifically cited to Listings §6.02 - Impairment of Renal Function, §5.05 - Chronic

---

833 (3rd Cir. 1994) (new evidence may not relate to a "later acquired disability" or "the subsequent deterioration of a previously non-disabling condition.").

[15] Bowen v. Yuckert, 484 U.S. 137, 141, 107 S. Ct. 2287, 96 L.Ed.2d 119 (1987).

[16] 20 C.F.R. §404.1526(a).

[17] Bolan v. Barnhart, 212 F.Supp. 2d 1248, 1257 (D. Kan. 2002), citing Clifton v. Chater, 79 F.3d 1007, 1009 (10th Cir. 1996).

Liver Disease, §9.08 - Diabetes Mellitus, and §4.03 - Hypertension, delineating for each the medical and laboratory findings necessary to meet the required severity, and concluded that "the medical evidence (did) not contain the requisite findings to meet" these listings. [18] Plaintiff contends that the ALJ erred by failing to discuss the evidence relative to these listings, and by failing to consider listings §5.04 - Peptic ulcer disease , and §6.06 - Nephrotic Syndrome.

20. Although the ALJ's step three analysis could have been clearer, the decision contains sufficient findings and an adequate discussion of the evidence to permit meaningful review of the conclusion that Plaintiff's condition did not meet or equal Listings §§6.02, 5.05, 9.09 and 4.03. Further, I find that the ALJ was not required to consider Listing §§5.04 and 6.06.

21. To qualify under listing §6.02, a claimant must have an impairment of renal function that causes one of the following: (1) a rise in serum creatinine to 4.0 mg/dL, or reduction of creatinine clearance to 20 ml. per minute or less, (2) dialysis or (3) kidney transplant.[19] There is no medical evidence that Plaintiff required dialysis or kidney transplant, and there are no laboratory findings measuring creatinine clearance. The record does contain serum creatinine readings of 0.9 on December 1996, and 1.3 on December 24, 1997. (Tr. 108, 126), neither of which meet the criteria for Listing level severity.[20] The ALJ noted these creatinine levels in his decision. (Tr. 17).

---

[18] The ALJ also considered Listing §4.04 - Ischemic Heart Disease. However, Plaintiff does not raise any issue as to this Listing.

[19] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 6.02.

[20] Plaintiff apparently argues that his diagnoses of peripheral neuropathy in 2002 satisfies the criteria for Listing §6.02. (Docket No. __ p. 9) Plaintiff refers to Ex. D. There is no exhibit D. A diagnosis of peripheral neuropathy is found on the second page of an April 16, 2002 discharge summary found in Exhibit C. As previously indicated, Exhibit C is not material in that it does not pertain to the time period under review. Neurological examinations in the record for the time period under review indicate that Plaintiff's neurological examination was normal. (Tr. 109-110).

22. To qualify under Listing §5.05 - Chronic Liver disease, a claimant must have chronic liver disease which causes one of the following: (1) esophageal varices (enlarged arteries or veins), (2) a shunt operation for esophageal varices, (3) serum bilirubin of 2.5mg/dL or greater persisting on repeated examinations for five months or more, (4) ascites not attributable to other causes, (5) hepatic encephalopathy, or (6) confirmation of chronic liver disease by liver biopsy.[21] The ALJ referred to medical evidence indicating that Plaintiff was essentially asymptomatic despite his many medical conditions, including hepatitis C. (Tr. 19). Further, there is no evidence of esophageal varices, a shunt operation, ascites, hepatic encephalopathy or liver biopsy. The record contains serum bilirubin readings of 0.8 on June 20, 1997 (Tr. 136), and 0.8 on December 24, 1997 (Tr. 126), which do not meet the criteria for listing level severity.

23. To qualify under Listing §9.08, a claimant must have diabetes mellitus which causes one of the following: (1) neuropathy causing sustained disturbance of gross and dexterous movements or gait and station, (2) acidosis measured by appropriate pH, PCO2 or bicarbonate levels occurring on average every two months, (3) amputation or (4) retinitis proliferans.[22] with specified findings on visual examination.[23] Plaintiff argues that the listing is met by his diagnosis of diabetic retinopathy (Docket No. 9, p. 10). The medical record contains no diagnosis of "retinitis proliferans" nor is there medical evidence of findings on vision exam which meet Listing level severity.

24. Listing §4.03 requires evaluation under listings 4.02 (chronic heart failure), 4.04 (ischemic

---

[21] 20 C.F.R. Pt. 404, Subpt. P. App. 1, §5.05.

[22] "Neovascularization of the retina associated especially with diabetic retinopathy." Merriam-Webster Medical Dictionary, 1997.

[23] 20 C.F.R. Pt. 404, Subpt. P. App. 1, §9.08.

11

heart disease), or the listings for the affected body system, including 2.02, 2.03, 2.04 (visual impairments), 6.02 (impairment of renal function), or 11.04 (central nervous system vascular accident).[24]  Plaintiff did not identify the relevant listing upon which he relies, other than to refer to his eye examination which indicated he had hypertensive retinopathy.  The record does not document any significant visual impairments (see ¶ 10, supra). As discussed earlier, the ALJ did not err in concluding that Plaintiff did not qualify under listings 6.02. That leaves listings 4.02, 4.04 and 11.04. There is no evidence to suggest that Plaintiff suffered from chronic heart failure, ischemic heart disease or central nervous system vascular accident.

25.     To qualify as disabled under Listing §5.04 - Peptic ulcer disease, a claimant must have peptic ulcer disease demonstrated by x-ray or endoscopy, with (1) recurrent ulceration after definitive surgery persistent despite therapy of (2) inoperable fistula formation or (3) recurrent obstruction demonstrated by x-ray or endoscopy or (4) weight loss as described under Listing §5.08[25]. There was no evidence of peptic ulcer disease in the materials submitted to the ALJ or to the Appeals Court.

26.     To qualify as disabled under Listing §6.06 - Nephrotic syndrome, a claimant must have significant anasarca, persistent for at least three months, accompanied by additional laboratory findings.[26]  Anasarca is defined as "generalized massive edema."[27]  There is no evidence that Plaintiff ever developed anasarca. (See, e.g., Tr. 110, "extremities showed a trace of edema").  It was not necessary for the ALJ to discuss a Listing involving a condition Plaintiff never exhibited.

---

[24] 20 C.F.R. Pt. 404, Subpt. P, App. 1, §4.03.

[25] 20 C.F.R. Pt. 404, Subpt. P, App. 1, §5.04.

[26] 20 C.F.R. Pt. 404, Subpt. P, App. 1, §6.06.

[27] Dorland's Illustrated Medical Dictionary 72 (27th ed.1988).

### The ALJ's Credibility Determination Is Supported by Substantial Evidence and the Application of Correct Legal Principles.

27.     " 'Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence.' "[28] "However, '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.' "[29] In reviewing an ALJ's credibility determination, the court should "defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility."[30] At the same time, the ALJ must explain why specific evidence relevant to each factor supports a conclusion that a claimant's subjective complaints are not credible.[31] "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."[32] "In making a finding about the credibility of an individual's statements, the adjudicator need not totally accept or totally reject the individual's statements." [33] Rather, the ALJ "may find all, only some, or none of an individual's allegations to be credible."[34]

28.     In assessing Plaintiff's credibility, the ALJ noted Plaintiff's claim of disabling pain and functional limitations and then referred to factors bearing on the type of pain and dysfunction Plaintiff

---

[28] Kepler v. Chater, 68 F.3d 387, 391 (10th Cir.1995) (quoting Diaz v. Sec'y of Health & Human Servs., 898 F.2d 774, 777 (10th Cir.1990)).

[29] Id., quoting Huston v. Bowen, 838 F.2d at 1133 (footnote omitted).

[30] Casias v. Sec'y of Health & Human Serv's, 933 F.2d 799, 801 (10th Cir.1991).

[31] Kepler v. Chater, 68 F.3d at 391; but see Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir.2000) (Kepler does not require formalistic factor-by-factor recitation of evidence).

[32] Id., quoting Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988). (footnote omitted).

[33] Social Security Ruling 96-7p, 61 Fed.Reg. at 34486.

[34] Id.

claimed to have.

>   *–Plaintiff's pain is precipitated by lifting medium to heavy weights.*
>
>   In written materials Plaintiff stated that was unable to do any *heavy* lifting. (Tr. 54, 73, 79). At his hearing he testified that he could not lift more than five pounds because of cramping and weakness in his fingers. (Tr. 38). He complained of spinal pain (Tr. 54) radiating down his legs and a hernia (Tr. 73), and attributed his inability to lift to fatigue. (Tr. 79). There is only one physical examination at which pain was addressed. At that time Plaintiff had no joint pains or musculoskeletal problems. (Tr. 109). There is no recorded diagnosis of hernia or mention of fatigue.
>
> *–The objective medical evidence contains no indication of muscle atrophy, swelling, muscle spasm, prolonged bed rest, or premature aging.*
>
>   The medical record is silent as to these factors other than "swelling." Plaintiff demonstrated no musculoskeletal problems as of January 27, 1998, and had only "trace edema" on that date. (Tr. 109-110).
>
> *–There are no neurological deteriorations.*
>
>   The medical record notes no neurological dysfunction. (Tr.110)
>
> *–There is no evidence of weight loss due to loss of appetite.*
>
>   Plaintiff's weight ranged from 205½ lbs. on November 18, 1996 (Tr. 123), to 192 lbs. on January 16 and January 27, 1998 (Tr. 114, 108). He was described as well nourished on January 27, 1998, with no GI complaints. (Tr. 109-110).
>
> *–Plaintiff did not use assistive devices to walk.*
>
>   In written materials Plaintiff stated that he used a cane when tired and sometimes first

thing in the morning. (Tr. 79). There is no confirmation of this claim in any medical record.

*–Plaintiff can clean, cook, shop and care for his personal needs, independently and appropriately.*

There is little evidence regarding Plaintiff's daily activities. In a written questionnaires he stated that he was able to dress himself (Tr. 79) and that he had to be careful getting in and out of the tub. (Tr. 85). He testified that he lived with his father, was able to work around the house until he got tired, and liked to play cards. (Tr. 37-39).

*–Plaintiff suffers no side effects of medication.*

There is no indication in the medical record that Plaintiff had any medication side effects.

*–Plaintiff was told to monitor his blood sugar regularly, follow a recommended diet and abstain from alcohol.*

Plaintiff was repeatedly advised to monitor his blood sugar, blood pressure, reduce or abstain from use of alcohol and referred to diabetic education programs. The record is clear that he repeatedly failed follow this advice. (Tr.107, 110-112,113,114, 116,120,121,123-124). This failure may impact on his right to receive benefits[35] but is of little use in evaluating his credibility.

*–There is no longitudinal medical history for treatment of disabling pain.*

The medical record fails to document any treatment for pain. Plaintiff was never evaluated for complaints of pain at UNMH, nor were any functional limitations noted

---

[35]See 20 C.F.R. §404.1530 and Teter v. Heckler 775 F.2d 1104 (10th Cir. 1985).

       in any treatment record.

29.    Although some of the factors relied upon by the ALJ were inconclusive or inappropriate to a credibility determination, on balance I find that there is substantial evidence to support discounting Plaintiff's testimony with regard to the severity of his pain.

The ALJ's RFC Findings Are Supported
by Substantial Evidence and the Application of Correct Legal Standards.

30.    The ALJ's finding regarding Plaintiff's lack of credibility does not compel a finding of not disabled. The ALJ must also determine Plaintiff's residual functional capacity ("RFC" herein) for work activity on a regular and continuing basis despite his limitations.[36]

31.    Plaintiff argues that the ALJ improperly relied on the report of Dr. Recalde, the non-examining medical advisor, in assessing RFC. I disagree. Generally, the opinions of nonexamining doctors are given less weight than those of examining doctors, but that does not mean opinions of medical advisors are entitled to no weight.[37] A medical advisor's opinion may be substantial evidence provided it is supported by other evidence in the record or when it is consistent with the other evidence.[38]

32.    Dr. Recalde's rationale for concluding that Plaintiff retained the RFC for light work is set forth at ¶ 11, supra. Additional medical records were gathered following Dr. Recalde's review. (See ¶¶ 13 and 14, supra.) In as much as Plaintiff is described as asymptomatic by Dr. Spaulding and no physical limitations are assigned by any treating physician, Dr. Recalde's opinion is consistent with

---

[36] 20 C.F.R. §404.1545.

[37] See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir.1995).

[38] Id.

all medical evidence of record. Accordingly, I find that substantial evidence supports the ALJ's finding that Plaintiff retained the RFC for light work, and that the ALJ applied correct legal principles in assessing Plaintiff's RFC.

Plaintiff Failed to Establish Non-exertional Impairments.

33.     Plaintiff argues that the ALJ erred by failing to consider his non-exertional impairments of fatigue, visual limitation and restriction in hand usage. Plaintiff essentially argues that the ALJ should have believed his testimony concerning these conditions since his underlying medical conditions are known to produce these limitations. There is no medical evidence indicating that Plaintiff suffered from these non-exertional impairments. Plaintiff was "asymptomatic" on January 27, 1998. (Tr. 108). There is no recorded complaint in the medical record of fatigue or problems with hand usage. Plaintiff's vision was corrected to 20/20 with glasses. (Tr. 96-97). Plaintiff did not carry his burden of proof in establishing the existence of non-exertional impairments. Accordingly, the ALJ did not have to consider non-exertional impairments in assessing Plaintiff's RFC.

The Alleged Incompetency of Plaintiff's
Lay Representative Does Not Provide a Basis for Remand.

34.     Finally, Plaintiff contends that the matter should be remanded due to the incompetency of the lay representative. Plaintiff presents no legal authority for this proposition. The inadequacies of representation he argues could have been cured in proceedings before the Appeals Council.

Recommended Disposition

35.     For the reasons stated above, I recommend that Plaintiff's Motion to Reverse and Remand the Administrative Agency Decision (Docket No. 8) be denied, and the decision of the Commissioner denying Plaintiff's Application for Disability Insurance Benefits be affirmed.

Richard L. Puglisi<br>
United States Magistrate Judge